**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

United States District Court
Southern District of New York

7:20-cv-00277

| |
|---|
| Jennifer Collishaw, individually and on behalf of all others similarly situated, |
| Plaintiff, |
| - against - |
| Cooperative Regions of Organic Producer Pools, |
| Defendant |

Class Action Complaint

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Cooperative Regions of Organic Producer Pools ("defendant") manufactures, distributes, markets, labels and sells single serving cartons of milk purporting to be flavored exclusively by vanilla under their Organic Valley brand ("Products").

2.     The Products are available to consumers from retail and online stores of third-parties and are sold in sizes of cartons of 11 OZ (330 mL).

3.     The Product's relevant front label representations include "Organic Valley," "High Protein Milk Shake," "50% Less Sugar Than Before," "Fuel," "20g Protein Per Serving," "USDA Organic," "Vanilla" and a vignette of the flower of the vanilla plant atop cured vanilla beans.



4. The back and side panels includes the Nutrition Facts, ingredient list and statements "No Compromises in Ingredients or Taste" and "A High Quality Protein Shake."



I. Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

5. The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized

2

flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[1]

6.     Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[2]

7.     Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[3]

8.     It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[4]

9.     This demand could not be met by the natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

10.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive

---

[1] 21 C.F.R. §169.3(c).
[2] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[3] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.
[4] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

oil made from cottonseeds to the horsemeat scandal in the European Union.[5]

11.    Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.    Food Fraud as Applied to Vanilla

12.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[6]

13.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[7]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor |
| | • Caramel to darken the color of an imitation vanilla so it |

[5] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.
[6] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[7] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

|  | more closely resembles the hue of real vanilla[8] |
|  | • Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, derived from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[9]<br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[10]<br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give | • Injection of vanilla beans with mercury, a poisonous |

---

8 Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.
9 Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
10 Berenstein, 423.

the impression there is more of the product than there actually is

substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list

  o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

➢ Ingredient List Deception[11]

  o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

  o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food; often containing high amount of vanillin, which must be disclosed as an *artificial* flavor when paired with vanilla

B.  <u>The Use of Vanillin to Simulate Vanilla</u>

14.    The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

15.    First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

16.    According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to

---

[11] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

a full gallon of single-fold vanilla extract."[12]

17. Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

18. Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

19. Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

20. This means that if a product is represented as being characterized by vanilla yet also contains non-vanilla vanillin, the label and packaging must declare the presence of vanillin and identify it as an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is "Vanilla-vanillin extract _-fold" or "_-fold vanilla-vanillin extract", followed immediately by the statement "contains vanillin, an artificial flavor (or flavoring)".); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (similar declarations required for Vanilla-vanillin flavoring and Vanilla-vanillin powder).

21. This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

C. Emphasis on Producing "Natural Vanillins" and Pairing with "Natural Vanilla"

22. The past ten years have seen the introduction of vanillin ingredients that purport to

---

[12] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

be a "natural flavor," based on the raw material being a natural source and undergoing a natural production process.

23.    While vanillin can be made in an allegedly "natural" fermentation process from ferulic acid, the cost is prohibitive for use in most applications.

24.    When eugenol, from cloves are used to produce vanillin, it is subject to chemical reactions and processes considered to be synthetic by the FDA.

25.    These low-cost "natural vanillins" are produced by the ton in China, with little transparency or verification, before being delivered to the flavor companies for blending.

26.    "Natural vanillin" is not a "natural vanilla flavor" because the raw material is typically petrochemicals or tree pulp instead of vanilla beans.

II.    Flavor Industry Efforts to Use Less Vanilla, Regardless of any Shortages

27.    The "flavor industry" generally refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

28.    The more recent global shortage of vanilla beans has again forced the flavor industry to "innovate[ing] natural vanilla solutions…to protect our existing customers."[13]

29.    Their "customers" do not include the impoverished vanilla farmers who are at the mercy of these global conglomerates nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

30.    These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which either completely or partially replace vanilla.

---

[13] Amanda Del Buouno, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

A.  Flavor Industry's Attempt to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

31.   On the surface, the flavor industry has developed schemes such as "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to assure a significant supply of vanilla at stable, reasonable prices while also looking out for the impoverished farmers.

32.   In reality, these programs are designed to produce to less vanilla and keep its cost out of reach.

33.   The "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified" have been silently questioned among the vanilla farmers of Madagascar.

34.   Reports have circulated that contrary to promoting "sustainability" of vanilla, these programs actually make vanilla less "sustainable" by paying cash to farmers to destroy their vanilla crops under the guide of "crop diversification" and switch to the ubiquitous palm oil.

35.   There have also been allegations that Unilever's Rainforest Alliance Certified Program actually uses child and/or slave labor.

36.   Other tactics alleged to be utilized by companies such as Syrmise and Givaudan include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to any remaining bidders.[14]

37.   The reasons that the flavor companies take what seems to be counterintuitive actions is because they benefit from high vanilla prices and the use of less real vanilla.

38.   When less vanilla is used due to higher prices, companies are compelled to purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.  Use of Vanilla WONF Ingredients to Replace and Provide Less Vanilla

---

[14] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

39.     Though flavor companies will not admit the above allegations, the conclusions are consistent with the comments of industry executives.

40.     According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

41.     The head of "taste solutions" at Irish conglomerate Kerry, urged flavor manufacturers must "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

42.     A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[15]

43.     These compounded flavors typically exist in a "black box" and "consist of as many as 100 or more flavor ingredients," including potentiators and enhancers, like maltol and piperonal, and added vanillin, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[16]

44.     The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s but strong self-policing, regulatory enforcement and ample supplies of vanilla beans caused the last 10 years to see the proliferation of this ingredient.

45.     According to those knowledgeable about the flavor industry, there are generally two types of Vanilla WONF.

---

[15] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[16] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

i.   Vanilla WONF with "Natural Vanillin"

46.   One version of Vanilla WONF contains some real vanilla but contains high amounts of "natural vanillin."

47.   This ingredient is designated as "Natural Flavor," which is contrary to law because vanillin has always been an artificial flavor when used with vanilla, regardless of whether it is made through a "natural process."

ii.   Vanilla WONF with "Enhancers" and "Extenders"

48.   The other type contains some real vanilla and either will contain flavor "enhancers" or "extenders" like piperonal, maltol and ethyl maltol

49.   or consist of a formula similar to the "flavorless" Vanguard vanilla extender, *supra*.

50.   One of the more well-known efforts at circumventing the law was the development of *Vanguard* in the late 1970s by David Michael & Co., Inc., currently part of International Flavors & Fragrances ("IFF").

51.   Either in reacting to vanilla shortages or merely trying to boost their bottom line, David Michael developed a "natural flavor enhancer" that supposedly "contain[ed] no vanilla, vanillin, ethyl vanillin, or any artificial flavor."

52.   Instead, these flavorings were "blend[s] of dozens of plant extractives, roots, and botanicals, all natural ingredients found on the GRAS list."

53.   On ingredient lists, a product made with Vanguard would state "vanilla extract, natural flavor."

54.   Dubbed "Vanguard," this ingredient was said to reduce the amount of real vanilla used by up to half and was self-described as a "flavorless" flavor substance.

55.   For Category 1 ice cream, David Michael promoted Vanguard by telling customers

it was not necessary to declare any flavor other than vanilla on the front label, because vanilla extract still provided the "characterizing flavor" and justified

56.     For non-ice cream applications, David Michael gave slightly different arguments based on the differences in flavor labeling for such products.

57.     Specifically, Vanguard (and the many imitators) would not require a declaration of non-vanilla flavor on a front label because (1) it only contained non-vanilla flavors, (2) these non-vanilla flavors did not enhance, resemble or simulate vanilla, (3) the non-vanilla flavors merely served to "round out" any harsher notes or ancillary flavors and (4) the non-vanilla flavors "masked" dairy and off-flavors.

58.     In either type of Vanilla WONF, non-vanilla flavorings and compounds are used so consumers will think a product has more real vanilla than it actually does and expect all of the vanilla taste to be from vanilla.

59.     Several years later, the FDA settled the matter (at least in regards to ice cream) by rejecting the deceptive efforts of David Michael and restoring vanilla to its status as first among equals amongst the flavors.

C.     Decline of Industry Self-Governance

60.     That high level executives in the flavor industry are willing to openly boast of their stratagems to give consumers less vanilla for the same price is not unexpected.

61.     This is due in part to the once powerful and respected trade group for the flavor industry, The Flavor and Extract Manufacturers Association ("FEMA"), abandoning its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

62.     Though FEMA previously opposed efforts of industry to deceive consumers, it cast the general public to the curb in pursuit of membership dues from its largest members, such as

Unilever, rumored to have been behind FEMA's abandonment of self-regulation.

III. Flavor Labeling Applied to Products Represented as "Vanilla"

63.    "Natural flavor" refers to "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents" from a natural source such as plant material and can refer to combinations of natural flavors. *See* 21 C.F.R. § 101.22(a)(3).

64.    "Artificial flavor" is any substance whose function is to impart flavor that is not derived from a natural source. *See* 21 C.F.R. § 101.22(a)(1).

65.    21 C.F.R. § 101.22(i) sets out factors which affect how flavors are designated and include (1) the presence of "natural flavor," and/or "artificial flavor," (2) whether the natural and artificial flavor simulates, resembles or reinforces the characterizing flavor, (3) whether the natural flavor is obtained from the food ingredient represented as the characterizing flavor – i.e., does the peach flavor come from real peaches or is it synthesized from apricots? and (4) the relative amounts of the different flavor types. *See* 21 C.F.R. § 101.22(i)(1)(i)-(iii), 21 C.F.R. § 101.22(i)(2).

66.    These requirements exist because natural flavors are more expensive than artificial flavors, and the source and amount of flavoring in a food affects consumers' willingness to purchase and consume the food.

67.    A product labeled "Vanilla _____" gives the impression that all the flavor (taste sensation and ingredient imparting same) in the product is contributed by vanilla beans. *See* 21 C.F.R. § 101.22(i)(1) (describing a food which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii)).

68.    Assuming a product contains an "amount of characterizing ingredient [vanilla] insufficient to independently characterize the food, or the food contains no such ingredient," the product would be required to be labeled as "Vanilla flavored _____" or "natural vanilla

flavored _____ ." *See* 21 C.F.R. § 101.22(i)(1)(i).

69.   The absence of the term "flavored" where a food is labeled "Vanilla" gives consumers the impression the food contains a sufficient amount of vanilla to characterize the food.

70.   If the characterizing flavor is vanilla and none of the natural flavor used is from vanilla, the flavor designation is required to be "artificially flavored" or with the flavor of the product from which the natural flavor is derived, i.e., "clove flavored vanilla _____." *See* 21 C.F.R. § 101.22(i)(1)(ii).

71.   If a food characterized as vanilla contains some vanilla and "other natural flavor which simulates, resembles or reinforces the characterizing flavor [vanilla]," the options for labeling the food are based upon whether it contains a sufficient amount of the characterizing flavor to independently characterize the food. *See* 21 C.F.R. § 101.22(i)(1)(iii) ("the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section").

72.   If the food contains a sufficient amount of vanilla to independently characterize the food and "other natural flavor," the labeling would state "Vanilla With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii); *see also* 21 C.F.R. § 101.22(i)(1) ("introductory text" describing scenario where food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

73.   If the food contains an insufficient amount of vanilla to independently characterize the food and "other natural flavor," the labeling would state "Vanilla Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section," 21 C.F.R. § 101.22(i)(1)(i).

A.   Labeling of Flavors on a Food's Ingredient List

74.   If an exclusively vanilla ingredient is added to a food, it is required to be labeled by

its common or usual name provided by its standard of identity. *See* 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of vanilla'."); *see also* 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'").

75.     Reasons for combining flavors prior to use include: (1) ease of use from having to manage fewer suppliers, (2) ensuring the flavors complement and enhance each other, (3) the ability to use of the more expensive flavor, (4) consistency within product batches the flavor combination is added to and (5) volatile nature of flavoring constituents.

76.     When vanilla is combined with other natural flavors, the ingredient list often deceptively identifies this ingredient lists in one of the following ways:

- [Natural] Vanilla Flavor with Other Natural Flavor
- Vanilla Extract with Other Natural Flavor
- [Natural] Vanilla Flavor, Natural Flavor
- Vanilla Extract, Natural Flavor
- Vanilla Flavor, [INTERVENING INGREDIENTS], Natural Flavor
- Vanilla Extract, [INTERVENING INGREDIENTS], Natural Flavor
- Natural Flavor, [INTERVENING INGREDIENTS], Vanilla Extract
- Natural Flavor, [INTERVENING INGREDIENTS], Vanilla Flavor

77.     This practice, referred to as "ingredient splitting" or "flavor splitting," is misleading for several reasons.

78.     In terms of "predominance by weight," vanilla extract or strawberry flavor will be present in a greater amount than the flavors and flavor potentiators it is combined with.

79.     However, flavors (other than the separate addition of an exclusively vanilla ingredient) are not permitted to be listed in order of predominance by weight and must be labeled "natural flavor" or "artificial flavor."  *See* 21 C.F.R. § 101.4(b)(1) ("Spices, flavorings, colorings

and chemical preservatives shall be declared according to the provisions of 101.22.") citing 21 C.F.R. § 101.22(h)(1) ("Spice, natural flavor, and artificial flavor may be declared as "spice", "natural flavor", or "artificial flavor", or any combination thereof, as the case may be.").

80.    Since flavorings are present in relatively small amounts to begin with and consist of highly concentrated flavors and potentiators, listing a named flavor in front of the unspecified "natural flavor" gives the impression there is more of the identified flavor than is the case.

81.    The only circumstance where components of an ingredient are permitted to be placed into the list of ingredients in order of predominance by weight is where (1) an ingredient contains two or more ingredients and (2) has a common or usual name or a standard of identity. *See* 21 C.F.R. § 101.4(b)(2)(ii).

IV. The Product is Misleading Because it Contains Non-Vanilla Flavor and/or Components

82.    The Product is required to be labeled consistent with the flavor regulations in 21 C.F.R. §101.22. See 21 C.F.R. §131.110 ("Milk"); see also 21 C.F.R. §131.110(e) ("Nomenclature").

83.    The front label statements and/or images of "Vanilla" are understood by consumers to identify a product where (1) vanilla is the characterizing flavor, (2) vanilla is contained in a sufficient amount to flavor the product, (3) the flavor is provided by an exclusively vanilla ingredient, (4) no other flavors simulate, resemble, reinforce, or enhance flavoring from vanilla or permit less real vanilla to be used and (5) vanilla is the exclusive source of flavor.

A.    Ingredient List Declaration of "Vanilla Flavor" and "Natural Flavor" Reveals Flavor is Not Exclusively Vanilla

84.    The Product's representations are misleading because (1) the front label represents the Product's characterizing flavor is vanilla without qualification and (2) the side panel statements

of "A High Quality Protein Shake" and "No Compromises in Ingredients or Taste" gives consumers the impression that the Product will only contain vanilla for flavor ("High Quality") and will not make sacrifices ("No Compromises in Ingredients") by using less vanilla.

85.     These representations are false, deceptive and misleading because the ingredient list reveals the Product's flavoring consists of "Organic Fair Trade Vanilla Flavor" and "Organic Flavor."

Ingredient List



**INGREDIENTS:** ORGANIC FILTERED GRADE A SKIM MILK, ORGANIC GRADE A CREAM, ORGANIC FAIR TRADE VANILLA FLAVOR, ORGANIC FLAVOR, SALT, LACTASE ENZYME, GELLAN GUM, ORGANIC STEVIA, VITAMIN D3.

86.     Defendant will offer a variety of justifications for the presence of non-vanilla flavor in a product whose front label exclusively identifies "vanilla" as the characterizing flavor.

B.   "Non-Characterizing" Flavors Which Enhance Characterizing Flavors

87.     Defendant likely will claim the "organic flavor" does not contain any flavor of its own and is a "masking" flavor used to block or limit taste sensation caused by other ingredients.

88.     These non-detectable flavors are described as working "in the background with the characterizing notes, elevating them to their true potential. Other times they will subdue off flavors from other ingredients in the system, once again, allowing the characterizing flavor to shine."[17]

---

[17] Donna Berry, Modifying Flavor in Dairy Foods, April 11, 2018, Food Business News.

89.     This function is equivalent to "reinforcing" the characterizing flavor so less of such flavor is needed in the product, thereby requiring its use be declared on a product's front label. 21 C.F.R. § 101.22(i)(1)(iii) ("other natural flavor which simulates, resembles or reinforces the characterizing flavor").

V.      Conclusion

90.     The amount of the characterizing components, vanilla, has a material bearing on price or consumer acceptance of the Product because it are more expensive and desired by consumers.

91.     The Product is misleading because it does not contain the amount, type and percentage of vanilla as a component of the total flavor ingredients that is required and consistent with consumer expectations because the non-vanilla flavors permit the use of less vanilla.

92.     Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

93.     The Product contains other representations which are misleading and deceptive.

94.     As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $3.99 per 11 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

95.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

96.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

97.     Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

98.     This is a reasonable assumption because defendant's Products are sold in thousands of stores across the nation and have been sold bearing the allegedly misleading claims for several years.

99.     Plaintiff Jennifer Collishaw is a citizen of New York.

100.   Defendant Cooperative Regions of Organic Producer Pools is a Wisconsin agricultural cooperative with a principal place of business in La Farge, Vernon County, Wisconsin and is a citizen of Wisconsin

101.   This court has personal jurisdiction over defendants because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

102.   Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

103.   A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

104.   Plaintiff Jennifer Collishaw is a citizen of Sloatsburg, Rockland County, New York who purchased the Product during the statutes of limitations for the causes of action alleged.

105.   Defendant Cooperative Regions of Organic Producer Pools is a Wisconsin agricultural cooperative – specifically, an agricultural cooperative – with a principal place of business in La Farge, Wisconsin, Vernon County.

Class Allegations

106.  The classes will consist of all consumers in New York, the other 49 states and a nationwide class where applicable.

107.  Common questions of law or fact predominate and include whether defendant's representations and practices were likely to harm plaintiff and if plaintiff and class members are entitled to damages.

108.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive actions.

109.  Plaintiff is an adequate representative because her interests do not conflict with other members.

110.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

111.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

112.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

113.  Plaintiff seeks class-wide injunctive relief because the practices continue.

New York GBL §§ 349 & 350
(Consumer Protection from Deceptive Acts)

114.  Plaintiff incorporates by reference all preceding paragraphs.

115.  Plaintiff and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

116.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

117.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair

because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and did not contain other flavor ingredients which enabled use of less of the characterizing flavor.

118.  Plaintiff and class members relied on the representations and paid more for the Products as a result of what defendant stated about the Products.

119.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

120.  Plaintiff incorporates by reference all preceding paragraphs.

121.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products through representing they contained sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and did not contain other flavor ingredients which enabled use of less of the characterizing flavor.

122.  Defendant had a duty to disclose and/or provide non-deceptive labeling of the Product and its components and ingredients, and knew or should have known same were false or misleading.

123.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

124.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

125.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the

Products.

126.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

### Breaches of Express Warranty, Implied Warranty of Merchantability and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

127.  Plaintiff incorporates by reference all preceding paragraphs.

128.  Defendant manufactures and sells products which purport to contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products, and did not contain other flavor ingredients which enabled use of less of the characterizing flavor.

129.  The Products warranted to Plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

130.  Defendant had a duty to disclose and/or provide a non-deceptive description and identification of the Products.

131.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

132.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

133.  Defendant had received or should have been aware of the misrepresentations due to numerous complaints by consumers to its main office over the past several years.

134.  The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

135.  Plaintiff and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

136.  Plaintiff incorporates by references all preceding paragraphs.

137.  Defendant's purpose was to sell a product which purported to contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and did not contain other flavor ingredients which enabled use of less of the characterizing flavor.

138.   Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label.

139.  Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

140.  Plaintiff incorporates by reference all preceding paragraphs.

141.  Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant

to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   January 13, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
_____
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

7:20-cv-00277
United States District Court
Southern District of New York

Jennifer Collishaw, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Cooperative Regions of Organic Producer Pools,

Defendant

## Class Action Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  January 13, 2020

/s/ Spencer Sheehan
Spencer Sheehan